**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

| | | |
|---|---|---|
| Board of Trustees of the Dakotas and Western Minnesota Electrical Industry Health and Welfare Fund, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | **ORDER ON MOTION FOR SUMMARY JUDGMENT** |
| vs. | ) ) | Case No. 3:24-cv-199 |
| Arrow Electric Inc., | ) ) | |
| Defendant. | ) | |

Board of Trustees of the Dakotas and Western Minnesota Electrical Industry Health and Welfare Fund, et al. (collectively, the "Trustees"), sued Arrow Electric Inc. ("Arrow") under the Employee Retirement Income Security Act ("ERISA") and the Labor Management Relations Act ("LMRA") for breach of several interest construction agreements and to enforce an arbitration award binding Arrow to a successor interest construction agreement. Doc. 1, p. 2. The Trustees now move for partial summary judgment regarding Arrow's liability under the successor agreement. Doc. 14. For the reasons below, the Trustees' motion is granted.

## I.    BACKGROUND

The Trustees are comprised of the boards of various trust funds[1]. Doc. 15, p. 2. The funds receive contributions from employers pursuant to collective bargaining agreements ("CBAs")

---

[1] The funds include the Dakotas and Western Minnesota Electrical Industry Health and Welfare Fund, the Dakotas Areawide IBEW-NECA Savings and Retirement Plan, the Dakotas Areawide IBEW-NECA Vacation and Holliday Plan, the Dakotas and Western Minnesota Apprenticeship Training Fund, the National Electrical Benefit Fund, the National Electrical Industry Fund, and the National Labor-Management Cooperative Fund. Doc. 15, p. 2.

between the International Brotherhood of Electrical Workers Local Union No. 714 ("Union") and the Dakotas Chapter of the National Electrical Contractors Association ("NECA"). Id.

In 2013, Arrow signed a Letter of Assent authorizing NECA to represent it in collective bargaining with the Union. Doc. 15 at 3. As a result, Arrow agreed to be bound to a series of CBAs, including the agreement at issue in this litigation, the 2021-2024 Inside Construction Agreement ("ICA").[2] Doc. 15 at 1-2. The 2021-2024 ICA contains an interest arbitration clause, stating:

> Unresolved issues or disputes arising out of the failure to negotiate a renewal or modification of this agreement . . . may be submitted jointly or unilaterally to the Council [on Industrial Relations for the Electrical Contracting] for adjudication . . . . The Council's decisions shall be final and binding.

Doc. 1-4, p. 4.

In January 2020, Arrow executed an acknowledgment recognizing the Union as the "[s]ection 9(a) collective bargaining agent for all of [Arrow's] employees performing electrical construction work within the jurisdiction of [the Union]." Doc. 15-2, p. 8. This acknowledgment recognized that a majority of Arrow's employees authorized the Union to represent them in collective bargaining. Id.

In January 2024, employees advised Arrow President Russ Howes that they no longer wanted to be represented by the Union. Doc. 16-1, p. 2. Arrow then notified NECA and the Union of its intent to terminate the Letter of Assent. Doc. 1-5, p. 2. As a result, the Union sought to negotiate with Arrow directly for a successor agreement. Doc. 16-1 at 2. But Arrow informed the Union that it was "terminating the Inside Construction Agreement" between NECA and the Union. Doc. 15-2 at 19.

---

[2] The other CBAs include the 2017-2020 ICA and the 2020-2021 ICA. Doc. 15 at 1-2.

On April 13, 2024, the Union informed Arrow it would file unilaterally for the issue of a successor agreement to be heard before the Council on Industrial Relations ("CIR"). Doc. 15 at 4. On April 16, 2024, the Union again notified Arrow of its intent to submit the matter to the CIR and asked whether it should file jointly or unilaterally. Id. Arrow responded that the Union should file unilaterally. Id.

The Union submitted the matter to the CIR pursuant to the terms of the 2021-2024 ICA. Doc. 15-2 at 4. On April 19, 2024, the CIR emailed Arrow a hearing notice. Doc. 15-5, pp. 2-3, 6-7. The notice provided the hearing date, location, and information regarding brief and document submission. Id. at 7.

On May 13, 2024, Arrow employees met to vote on Union membership. Doc. 16-1 at 3. The vote was carried out anonymously and revealed that all employees no longer wanted to be part of the Union. Id. Arrow emailed the Union, stating: "Bob, Attached is the formal vote taken at the shop on May 13, 2024. In a unanimous vote, 13-0 . . . Arrow Electric will no longer be IBEW/Neca represented effective date June 1, 2024." Id. at 15.

On May 14, 2024, the CIR emailed Arrow a second notice of the hearing scheduled for May 21, 2024. Doc. 16-1 at 33. Arrow responded, stating: "Services of the council will not be needed . . . company took a vote and it was unamimous [sic] . . . ." Doc. 15-5 at 14. The CIR replied that only the filing party could request case removal from the docket. Id. at 16. On June 20, 2024, the CIR issued its decision binding Arrow to the 2024-2026 ICA. Id. at 18-20. Arrow did not seek to vacate the award, and the Trustees allege Arrow has not complied with its obligations under the 2024-2026 ICA. Doc. 15 at 14-15.

The Trustees filed suit with this Court on September 26, 2024. Doc. 1. The complaint contains two counts of breach. The first count pertains to the 2017-2020, 2020-2021, and 2021-

2024 ICAs and requests a payroll compliance audit to ensure that Arrow properly remitted contributions to the Trustees under those agreements. Id. at 6-7. The second count first seeks a determination of liability that Arrow is bound to the 2024-2026 ICA. Id. at 9. After determining liability, the second count requests a payroll compliance audit to determine what contributions are owed under the 2024-2026 ICA. Id. The Trustees now move for summary judgment to establish Arrow's liability under the 2024-2026 ICA. Doc. 14.

## II.    LAW AND DISCUSSION

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Courts must afford "the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." TCF Nat'l Bank v. Mkt. Intel., Inc., 812 F.3d 701, 707 (8th Cir. 2016) (citation omitted). Arrow argues (1) that the notice of the CIR was improper and should be excluded from evidence, (2) that it had no duty to participate in arbitration because the Union lost majority status, and (3) that participating in arbitration would have required Arrow to violate the law.

### A.    Exclude Evidence

As an initial matter, Arrow argues that notice of the CIR was improper and should be excluded from evidence. Doc. 16, p. 22. Specifically, Arrow argues that the Trustees "base the majority of their arguments on an affidavit of [an] individual that was not disclosed during the parties' Rule 26 Initial Disclosure exchange in January 2025[,]" and as such, "pursuant to Rule 37(c)(1), the untimely disclosure of the witness and his documents should be excluded from

evidence." Doc. 16 at 6. The Trustees argue their supplemental disclosure of the witness—at a time when discovery remained open—means no Rule 26 violation occurred. Doc. 20 at 4. The Trustees alternatively argue that any purported violation is both justified and harmless. Id. at 5.

The individual at issue is CIR Secretary Al Davis. Davis' affidavit discusses the CIR case and the pre-hearing notices provided to Arrow and the Union. Doc. 15-5 at 2-4. Davis states that the CIR emailed Arrow two separate notices about the CIR proceedings and gave Arrow access to the CIR case management system. Id. The notices are attached as exhibits to the affidavit. Id. at 6-8, 12. The first notice provides the hearing date, location, and information regarding brief and document submission. Id. at 7. The second notice provides the hearing date, time, location, and when to arrive. Id. at 12. Importantly, Davis states that Arrow President Russ Howes responded to the second notice and attempted to remove the case from the CIR's docket. Id. at 3, 14.

If a party fails to identify a witness required under Rule 26, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). To determine whether a Rule 26 violation was justified or harmless, courts in the Eighth Circuit consider "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." Rodrick v. Walmart Stores E., L.P., 666 F.3d 1093, 1096-97 (8th Cir. 2012) (quoting Jacobsen v. Deseret Book Co., 287 F.3d 936, 953 (10th Cir. 2002)). "[T]he exclusion of evidence is a harsh penalty and should be used sparingly." Wegener v. Johnson, 527 F.3d 687, 692 (8th Cir. 2008). "The 'use of an undisclosed witness should seldom be barred unless bad faith is involved.'" Bergfeld v. Unimin Corp., 319 F.3d 350, 355 (8th Cir. 2003) (quoting Mawby v. United States, 999 F.2d 1252, 1254 (8th Cir. 1993)).

Arrow did not suffer surprise in this case. It learned about Davis more than two months before discovery closed. Doc. 8 (noting the discovery deadline of August 29, 2025). Given that one of Arrow's defenses is that it failed to have notice of the CIR proceeding, Arrow should have anticipated testimony and evidence from someone in Davis' position. Doc. 4 at 5 ("Defendant alleges that the Union . . . [failed] to provide Defendant with proper notice of the CIR hearing."). Further, Arrow could have taken Davis' deposition before responding to the Trustees' summary judgment motion. Doing so would have cured any prejudice. And because this case is still in a pre-trial posture, the Trustees' late disclosure would not disrupt trial. As to bad faith or willfulness, Arrow points to no convincing evidence. In sum, the relevant factors weigh in favor of the Trustees. The Court will consider the evidence derived from Davis.

B.       **Interest Arbitration**

As to Arrow's second argument, it claims it provided the Union with "objective and verifiable evidence" that the Union no longer represented a majority of Arrow's employees, and therefore its obligations under the 2021-2024 ICA ceased. Doc. 16 at 6, 18. As a result, Arrow alleges it had no duty to participate in arbitration and that the award binding it to the 2024-2026 ICA is invalid. The Union counters that Arrow misrepresents the issue as representational instead of contractual. Doc. 20 at 7. According to the Union, the issue is whether Arrow is "legally bound by a successor ICA imposed by the CIR pursuant to a previously agreed-upon mandatory interest arbitration clause." Id.

Arrow's argument regarding representation and majority status stems from the National Labor Relations Act ("NLRA"). An employer is obligated under § 8(a)(5) of the NLRA to bargain with a union that has been "designated or selected," in the words of § 9(a), "for the purposes of collective bargaining by the majority of the employees." Generally, it is an unfair labor practice

for employers and unions to enter into CBAs when only a minority of employees have chosen the union as its bargaining representative. Nova Plumbing, Inc. v. N.L.R.B., 330 F.3d 531, 533-34 (D.C. Cir. 2003) (citing Int'l Ladies' Garment Workers' Union v. N.L.R.B., 366 U.S. 731, 737 (1961). However, § 8(f) allows employers and unions in the construction industry to enter into labor agreements before a majority of employees approve the union as its bargaining representative. Local Union No. 666, Int'l Bhd. Of Elec. Workers, AFL-CIO v. Stokes Elec. Serv., Inc., 225 F.3d 415, 418-19 (4th Cir. 2000) (citing Jim McNeff, Inc. v. Todd, 461 U.S. 260, 266 (1983). Section 8(f) unions can attain § 9(a) status through certified election or voluntary recognition based on a showing of majority support. Id. Once an employer recognizes a union as its bargaining representative, the employer "may unilaterally withdraw recognition from an incumbent union only where the union has actually lost the support of the majority of the bargaining unit employees." Levitz Furniture Co. of the Pac., 333 N.L.R.B. No. 105, p. 2. (2001).

Arrow argues that "an employer can defeat a post withdrawal refusal to bargain allegation if it shows, as a defense, the union's actual loss of majority status." Doc. 16 at 18. Arrow claims it is undisputed that the Union lost majority status on May 14, 2024. Id. at 18. As of that moment, Arrow alleges, it "could no longer recognize the Union and had no obligations to the Union upon the expiration of the 2021-2024 ICA on June 30, 202[4]." Id. Arrow cites a slew of National Labor Relations Board ("NLRB") decisions in support of its argument.

But Arrow's framing misstates the nature of the dispute. Courts and the NLRB have been careful to distinguish between statutory obligations under the NLRA and the contractual obligation to engage in interest arbitration. Here, the Union does not allege Arrow's improper refusal to bargain but rather seeks enforcement of interest arbitration awards. The primary issue is

7

contractual—whether the interest arbitration clause was binding and enforceable against Arrow at the time it was invoked.

Two NLRB cases illustrate the distinction between statutory and contractual obligations in the context of interest arbitration clauses. In IBEW Local No. 113, the issue was whether a union violated the NLRA by invoking interest arbitration after an employer withdrew from NECA. 296 N.L.R.B. 1095, 1989 WL 224423 (1989). The NLRB stated that "when parties have bargained for and reached an agreement," including one with an interest arbitration clause, "fairness requires that they be allowed to enforce it." Id. at 1098. Because interest arbitration is not a mandatory subject of bargaining, a dispute about the enforceability of such a clause is "primarily contractual." Id. at 1099. The NLRB held it is not "an unfair labor practice for a union to pursue adherence to [an interest arbitration] provision provided that the employer is arguably bound to it." Id. The NLRB defers to the courts on the issue of enforceability because "it is the courts, not the [NLRB], that are charged with determining the enforcement of provisions of contracts that do not involve mandatory subjects of bargaining." Id. (citing Allied Chem. Workers of Am. Local Union No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 184-88 (1971)).

The NLRB applied IBEW Local No. 113 in Sheet Metal Workers Local Union No. 20. 301 N.L.R.B. 258, 1991 WL 16567 (1991). The employer and union executed a CBA containing interest arbitration provisions. Id. After the agreement expired, the union invoked interest arbitration and the employer refused to participate. Id. at 258-59. The arbitrator issued an award directing the employer to execute a new CBA with the union. Id. at 259. The employer subsequently filed an unfair labor practice charge. Id. The NLRB held that so long as the interest arbitration clause was "arguably binding" on the employer, the union did not commit an unfair labor practice by invoking arbitration. Id. at 261. If the union can make a reasonable argument that

the contract allows it to submit "unresolved bargaining issues to interest arbitration," the union "will be free to invoke its contract rights, including pursuit of a court action to enforce the resulting agreement." Id. at 260.

The Eighth Circuit Court of Appeals has held that "[w]hen a dispute is properly submitted to arbitration pursuant to an agreement to arbitrate in a CBA, the resulting arbitration award is ordinarily entitled to extreme judicial deference." Local Union 257, Int'l Bhd. of Elec. Workers v. Sebastian Elec., 121 F.3d 1180, 1184 (8th Cir. 1997). "Moreover, our court has specifically recognized that 'once included in a [CBA] . . . interest arbitration clauses generally are enforceable." Id. (citing Sheet Metal Workers' Int'l Ass'n, Local 14 v. Aldrich Air Conditioning, Inc., 717 F.2d 456, 458-59 (8th Cir. 1983)).

The Eighth Circuit has also held that interest arbitration clauses may survive the termination of CBAs and that "employers . . . may be subject to the imposition of at least one undesired 'successor' agreement through interest arbitration." Int'l Bhd. of Elec. Workers, Local Union No. 124 v. Smart Cabling Solutions, Inc., 476 F.3d 527, 529 (8th Cir. 2007) (holding that the obligation to engage in interest arbitration survived the employer's termination of the CBA); see also Sebastian Elec., 121 F.3d at 1185 (8th Cir. 1997) (finding an interest arbitration clause survived the illegal termination of the CBA). But parties are protected against the "perpetuation of such agreements and the unwanted imposition of multiple generations of successor agreements" by court rulings holding that interest arbitration cannot result in the reimposition of an interest arbitration clause. Int'l Bhd. of Elec. Workers, Local Union No. 545 v. Hope Elec. Corp., 380 F.3d 1084, 1107 n. 3 (recognizing that the court will not enforce interest arbitration clauses imposed via interest arbitration); Aldrich Air Conditioning, 717 F.2d at 458-59 (8th Cir. 1983) (holding that an

9

interest arbitration clause was unenforceable where union invoked interest arbitration and the arbitrator awarded a successor agreement containing an interest arbitration clause).

Several other Circuits have held that the absence of an employer's statutory duty to bargain—via a union's loss of majority status, for example—does not extinguish an employer's contractual interest arbitration obligations. In Local Union No. 666, Int'l Bhd. of Elec. Workers, Afl-CIO v. Stokes Elec. Service, Inc., an employer executed an agreement recognizing a union as the § 9(a) collective bargaining agent for its employees. 225 F.3d 415, 419. While the union was a § 9(a) representative, the employer entered into several CBAs containing interest arbitration provisions. Id. When the employer sought to terminate the CBA, the union initiated arbitration proceedings. Id. at 420. The employer refused to participate, arguing it had no obligation to arbitrate because a majority of the employees no longer wished to be represented by the union. Id. In affirming the arbitration award entered in the employer's absence, the Fourth Circuit concluded that—even though the employer had no statutory duty to arbitrate due to the union's loss of majority—the employer had a contractual duty to arbitrate. See also Sheet Metal Workers' Int'l Ass'n, Local 206 v. R. K. Burner Sheet Metal, Inc., 859 F.2d 758, 762 (9th Cir. 1988) (holding that interest arbitration clauses survive the expiration of CBAs and rejecting the argument that contractual interest arbitration obligations are canceled by the absence of a statutory duty to bargain).

The Trustees cite the Eighth Circuit case of Local Union 257 v. Sebastian Electric in support of their argument. 121 F.3d 1180 (8th Cir. 1997). While not as analogous as Stokes, the case still offers some guidance. There, employers and a union maintained a § 8(f) relationship. The employers executed letters of assent authorizing NECA to represent them in collective bargaining with the union. Id. at 1181-82. While the letters of assent were in effect, NECA entered into CBAs

10

containing interest arbitration clauses. Id. at 1182. Later, the employers provided notice of their intent to terminate the letters of assent. Id. The union unsuccessfully attempted to negotiate a successor CBA with the employers. Id. The union submitted the issue to arbitration and the arbitrator issued awards directing the employers to implement new successor agreements. Id. The union filed federal court actions to enforce the arbitration awards, and the district court held the awards were binding and enforceable against the employers. Id. at 1183.

On appeal, the employers argued they were not bound to the CBAs—and, consequently, not bound by the arbitration clauses—because the union never established majority support before NECA entered into the CBAs. Id. at 1184. The Court rejected this argument, stating:

> We emphasize . . . that the lack of majority employee authorization of [the union] had no effect upon defendants' authorization of [NECA] to act on defendants' behalf in entering into the [CBAs] with [the union]. Thus, defendants' reliance on the . . . majority-employee-authorization provision to challenge the enforceability of interest arbitration awards is misplaced.
>
> We also reject defendants' general argument that union representation is a prerequisite to a binding labor agreement with enforceable terms. As the district court explained, an employer and a union may enter into a "pre-hire" agreement pursuant to § 8(f) . . . without a determination that a majority of employees desire representation by the union; such pre-hire agreements are binding, enforceable, and not subject to unilateral repudiation throughout their terms . . . .

Id. at 1184-85. The Court noted the issue was not representational but instead was "primarily contractual." Id. at 1186. In the end, the Court affirmed the holding that the interest arbitration clause under a § 8(f) agreement was binding and enforceable against the employers. Id. at 1187.

The above case law dictates that Arrow's loss of majority argument fails. The issue here is not representational but instead is "primarily contractual." Id. at 1186. Terminating a CBA or a union's loss of majority status does not end an employer's contractual duty to participate in interest arbitration. Here, it is possible that Arrow was not statutorily obligated to bargain with the Union if it could not establish itself as the representative of Arrow's employees. See e.g., Sebastian, 121

F.3d at 1185-86 (8th Cir. 1997). But the question of representation is not one for this Court to decide.[3]

The interest arbitration clause at issue was contained in a CBA that Arrow freely assented to before there was any question about the Union's status. The clause permitted the parties "jointly or unilaterally" to submit unresolved issues in negotiations to the CIR for adjudication. Doc. 1-4, p. 4. The Union did just that. Documents in the record make clear that Arrow was aware of the proceedings and the purpose for the adjudication. Doc. 15-5. Even if Arrow had no statutory duty to bargain with the Union, the Union is still able to enforce interest arbitration clauses in its agreements. Specifically, although Arrow perhaps had no statutory duty to bargain because of the Union's lack of majority support, "it was not for that reason relieved of its contractual obligation to submit to interest arbitration." Stokes, 225 F.3d at 424. The present case also does not involve the Eighth Circuit's concern in Hope regarding "the unwanted imposition of multiple generations of successor agreements." Here, the 2024-2026 ICA imposed by the CIR was not the progeny of multiple successor agreements. In fact, the CIR's renewed agreement was the first and only agreement imposed by an arbitrator pursuant to the binding arbitration clause.

Along these lines, Arrow argues the entire 2024-2026 ICA is unenforceable because it contains interest arbitration provisions. Doc. 16 at 24. The Trustees counter that the 2024-2026 ICA does not mandate interest arbitration and instead "permits—but does not require—either party to pursue CIR adjudication." Doc. 20 at 3. Regardless of whether the language is construed as an interest arbitration clause, Arrow's unenforceability argument is misplaced. Even if the 2024-2026

---

[3] "Representational issues fall within the NLRB's primary jurisdiction. Thus, '[w]e have recognized repeatedly that courts must refuse to exercise jurisdiction over claims involving representational issues.'" Sebastian, 121 F.3d at 1185 (8th Cir. 1997) (quoting United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus., Local 342 v. Valley Eng'rs, 975 F.2d 611, 613 (9th Cir. 1992).

ICA imposes interest arbitration, the Eighth Circuit has indicated that in such a case, courts "may invalidate an arbitration provision after one of the parties has terminated the master agreement." Smart Cabling Solutions, 476 F.3d at 529 (8th Cir. 2007). This focused remedy is far removed from Arrow's claim that the presence of an interest arbitration provision renders the entire ICA unenforceable.

Finally, Arrow claims "it would have been against the law for Arrow to participate in the CIR when the Union lost majority support[.]" Doc. 16 at 21. But Arrow cites no case that stands for the proposition that it is against the law to participate in interest arbitration after a union loses majority support. Instead, Arrow cites various NLRB cases involving representational issues. As discussed above, the issue here is distinct from representational questions decided by the NLRB.

In sum, even when viewed in the light most favorable to Arrow, the record shows that there is no genuine issue as to any material fact, that the interest arbitration clause was binding and enforceable against Arrow at the time it was invoked, and that the Union is entitled to judgment as a matter of law as to Arrow's liability under the 2024-2026 ICA.

## III.    CONCLUSION

For the reasons above, the Trustees' motion for partial summary judgment as to liability under the 2024-2026 ICA (Doc. 14) is **GRANTED**. Arrow is **ORDERED** to produce the payroll records necessary for the Trustees to determine damages under the agreement.

**IT IS SO ORDERED**.

Dated this 20th day of July, 2026.

/s/ Peter D. Welte
Peter D. Welte, Chief Judge
United States District Court